IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE MONEY SOURCE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LOANCARE LLC, <br><br> Defendant. | Civil Action No.: 18-cv-03523 <br><br><br> **AMENDED COMPLAINT** |

Plaintiff The Money Source, Inc. ("TMS"), by and through its undersigned counsel, submits this Amended Complaint against Defendant LoanCare, LLC ("LoanCare"), and hereby alleges as follows:

## THE PARTIES

1. TMS is a New York corporation with a principal place of business at 135 Maxess Road, Melville, Suffolk County, New York 11747.

2. Upon information and belief, LoanCare is a Virginia limited liability company with a principal place of business at 3637 Sentara Way, Virginia Beach, Virginia 23452.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1), as LoanCare and TMS are citizens of Virginia and New York respectively, and the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over LoanCare because LoanCare is a registered mortgage loan servicer in the State of New York and is registered as a foreign limited liability company with the New York Department of State.

5. In addition to the above, LoanCare had for all relevant time periods served as TMS's loan subservicer for all loans TMS issued to borrowers residing in New York State, and continues to provide residential mortgage loan subservicing services to other lenders for borrowers residing in New York.

6. TMS is a resident of this District because it maintains a principal place of business in Melville, Suffolk County, New York.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(3), because LoanCare is subject to the Court's jurisdiction, and can be said to reside in this District for purposes of this action.

## FACTS COMMON TO ALL COUNTS

### Background

8. TMS is a residential mortgage loan originator and provides loan servicing to many of its borrowers. It also is a loan servicer for loans originated by third-party lenders and/or mortgage holders. In that regard, TMS acquires the loan servicing rights for residential mortgage loans that have been originated and/or held by third parties.

9. For some residential loans for which it owns the servicing rights, TMS enters into contracts with loan subservicers who, pursuant to these agreements, manage the day-to-day administration of those loans and the collection of loan payments on behalf of TMS. The contracts TMS enters into with subservicers are called loan subservicing agreements. LoanCare is one such subservicer with which TMS had a loan subservicing agreement.

10. LoanCare and TMS entered into a subservicing agreement dated June 1, 2014 (the "Agreement"). In the Agreement, among other responsibilities, LoanCare agreed to collect

principal, interest, and other loan-related amounts owed from borrowers and provide all other administrative services necessary for the management of those loans on TMS's behalf.

11. The Agreement required LoanCare to "perform and discharge its duties, covenants, and obligations as subservicer . . . with a degree of care that is no less than that provided by industry sub-servicers generally."

12. LoanCare also agreed, warranted, and represented that up to two years after termination of the Agreement, it would continue to conduct itself with respect to any prior TMS loans it had serviced during the term of the Agreement in a manner that did not interfere with TMS's ability to conform with its loan servicing obligations to the related borrower.

13. In the event of litigation involving a borrower for whom LoanCare was at any time the subservicer for that borrower's loan, LoanCare agreed under the terms of the Agreement to "indemnify, defend, and hold harmless [TMS] from" losses: (a) arising out of LoanCare's "material failure to . . . perform all of its material obligations in compliance with the terms of the Agreement"; or (b) "gross negligence arising solely from [LoanCare's] own acts, or omissions or the willful misconduct of [LoanCare] in performing its obligations" under the Agreement.

14. Conversely, the Agreement required TMS to indemnify LoanCare for losses LoanCare realized "as a result of or arising out of the conduct of" TMS, including any dispute between borrowers and TMS and/or LoanCare, but only if the dispute "does not result from a breach of [LoanCare's] obligations" under the Agreement or its gross negligence.

15. Each parties' obligation to provide a defense to and indemnify the other, when the facts so required, was conditioned upon the indemnified party reasonably cooperating in the defense of an action.

16. The legal defenses, indemnifications, warranties, and representations set forth in the Agreement, and the related duties of good faith and fair dealing, survive the expiration or termination of the Agreement for two years.

17. Gene D. Ross, then-president of LoanCare, executed the Agreement on behalf of LoanCare on June 13, 2014.

18. Stavros Papastavrou, then-president of TMS, executed the Agreement on behalf of TMS on June 12, 2014.

19. The TMS portfolio that LoanCare was servicing was transferred back to TMS in August 2015. Accordingly, LoanCare's obligations, covenants, warranties and related duty of good faith and fair dealing under the Agreement continued for two years after servicing of the loans was transferred back to TMS.

### LoanCare Services Anastasia P. Diehl's Loan

20. On or about April 15, 2014, Anastasia P. Diehl, an Alabama resident, obtained a residential purchase money loan from Home Mortgage of America, Inc. (the "Diehl Loan"), which was secured by a mortgage on Diehl's home.

21. LoanCare subserviced the Diehl Loan for TMS pursuant to the Agreement.

22. As part of the termination of the Agreement, LoanCare reassigned the subservicing rights it had obtained from TMS under the Agreement. This reassignment of subservicing rights include the subservicing of the Diehl Loan.

23. On or about August 3, 2015, servicing of the Diehl Loan was transferred to TMS exclusively.

24. Accordingly, LoanCare's representations, warranties, and indemnifications with respect to the Diehl Loan continued for two years until in or around August 2017.

**The Borrower's Complaint Against LoanCare and TMS**

25. On March 20, 2017, Diehl filed a complaint against TMS, LoanCare, and three credit reporting agencies (Equifax, Inc., TransUnion, LLC, and Experian Information Solutions, Inc.) in the United States District Court for the Southern District of Alabama, Case No. 1:17-cv-00125-WS-B (the "Alabama Action").

26. Diehl alleged that on or about May 28, 2014, LoanCare advised her that TMS has engaged LoanCare to service the Diehl Loan. While the Diehl Loan was subserviced by LoanCare, Diehl alleged she enrolled in an "Equity Accelerator Program" (the "EAP"), under which her monthly mortgage payments were automatically withdrawn from her bank account in two equal but separate payments per month by an entity called Paymap, Inc. ("Paymap"). Paymap would then remit those amounts to LoanCare on behalf of Diehl.

27. Diehl claims that after servicing of her loan was transferred back to TMS in or around August 2015, her monthly mortgage payments continued to be automatically deducted from her account consistent with the EAP.

28. Diehl alleges that in February 2016, TMS advised her that it had not received her January 2016 mortgage payment. Diehl alleges that she received this notice despite the fact that the payment amount had been automatically withdrawn from her bank account.

29. However, TMS did not receive payments from Diehl or from LoanCare even though Paymap had withdrawn the payment amount from her account. Accordingly, TMS sent Diehl a past-due notice in February 2016.

30. Diehl alleges her February and March 2016 payments were automatically withdrawn from her account and were submitted to TMS, which then applied them to her loan.

However, she alleges that because those payments were not applied to the amount due for January, the Diehl Loan remained over 30 days in arrears.

31. Diehl further alleged that funds were withdrawn from her account for her April 2016 Loan payment. However, TMS did not receive that payment either.

32. Because TMS never received the payments due for January and April, 2016, it was led to believe Diehl had defaulted on the Diehl Loan. Accordingly, TMS commenced collection efforts against Diehl and reported her default to the credit agencies.

33. Based on the above, Diehl asserted the following claims: (a) violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e) against TMS; (b) breach of Diehl's mortgage agreement against TMS and LoanCare; (c) fraud against LoanCare; (d) invasion of privacy against TMS and LoanCare; (e) violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681(o) and (n) against the credit report agency defendants; and (f) FCRA violations against TMS.

34. Pursuant to the Agreement, and based on the limited information available to it at the time Diehl filed her complaint, TMS accepted LoanCare's tender of defense and demand for indemnification in the Alabama Action. TMS has been providing a legal defense in the Alabama Action on LoanCare's behalf for more than a year. In so doing, TMS has incurred counsel fees, costs, and other expenses well in excess of $75,000.

### LoanCare Misrepresents the Status of Diehl's Payments

35. On January 5, 2018, a LoanCare representative, Allison Bielby, was deposed in connection with the Alabama Action.

36. During the deposition, TMS learned for the first time that LoanCare had been aware that Diehl's January 2016 mortgage payment was erroneously sent to LoanCare through

the EAP. Bielby purposefully misrepresented that because TMS had assumed servicing of Diehl's loan as of August 3, 2015, LoanCare returned the January 1, 2016 payment to Diehl. Bielby claimed the payment was issued in a check dated February 9, 2016, and subsequently mailed to Diehl.

37. However, only 11 days later, on January 16, 2018, LoanCare sent TMS's counsel two checks each in the amount of $1,046.60, which is the monthly loan amount owed to TMS by Diehl. LoanCare sent the checks with no cover letter or note explaining why they were sent.

38. These checks were sent to TMS because, in fact, LoanCare knew all along it had erroneously received Diehl's payments for January 2016 and April 2016, but had not submitted those payments to TMS as it was obligated to do under the Agreement, let alone reimburse Diehl as its Bielby misrepresented.

39. Thus, in reality, LoanCare retained the two Diehl Loan payments for two years, without forwarding the payments to TMS or returning them to Diehl. Accordingly, because of LoanCare's gross negligence and breach of its representations, warranties, and obligations under the Agreement, TMS had no knowledge that the payments had ever been made.

40. LoanCare's gross negligence and breach of the Agreement by failing to remit Diehl's payments to TMS caused TMS to the begin collection efforts that led Diehl to file the Alabama Action in the first place.

41. In failing to notify TMS during the litigation that the payments had been made, LoanCare also breached its obligation to reasonably cooperate in the defense of the Alabama Action.

## COUNT ONE
(Declaratory Judgment)

42. TMS incorporates each of the allegations set forth above as if fully set forth herein.

43. As set forth above, after the Alabama Action was filed, LoanCare made a demand upon TMS for defense and indemnification. It did not however reveal that it had received the two mortgage payments Diehl alleged she had made or that it had retained those payments. At all relevant times, this was a fact about which LoanCare either knew or had constructive knowledge.

44. Thus, based on the limited information available to TMS at the time and the concealment by LoanCare, TMS agreed to defend and possibly indemnify LoanCare in the Alabama Action.

45. As set forth above, the Agreement required TMS to indemnify LoanCare only for disputes that did not arise from LoanCare's gross negligence or a breach of LoanCare's obligations under the Agreement.

46. The Alabama Action and the facts upon which it is based are the direct and proximate result of LoanCare's knowing or grossly negligent failure to either transmit Diehl's January and April mortgage payments to TMS or to return the same to Diehl. Given LoanCare's relationship with TMS and Diehl, it owed both the duty to disclose that it had received those payments. LoanCare also owed a duty to either transmit those payments to TMS or return them to Diehl.

47. The Agreement required LoanCare to "perform and discharge its duties, covenants, and obligations as subservicer . . . with a degree of care that is no less than that provided by industry subservicers generally." This includes transmittal of any payments it

receives from a borrower to TMS. This duty is both an expressed and equitable/implied duty and obligation, which survives the termination of the Agreement.

48. During the course of discovery in the Alabama Action, it has been revealed that in addition to LoanCare's gross negligence, its breach of its duty owed under the Agreement caused the injuries and damages alleged in the Alabama Action. Specifically, although the industry standard would have been for LoanCare to either return the January and April 2016 payments to Diehl or remit them to TMS, LoanCare failed to do so for approximately two years although it knew or had constructive knowledge that it had received those payments.

49. As a result, LoanCare breached its obligation under the Agreement to perform its duties as a subservicer with the degree of care exercised by industry subservicers.

50. LoanCare's breach of the Agreement directly caused TMS to mistakenly believe the Diehl Loan had not been paid and commence the collection efforts that gave rise to the Alabama Action.

51. Because the Alabama Action is the direct result of LoanCare's gross negligence and/or breach of the Agreement, TMS had and has no continued duty to defend and indemnify LoanCare.

52. In addition to the above, TMS's duty to indemnify LoanCare is conditioned on LoanCare reasonably cooperating in the defense of the Alabama Action.

53. LoanCare has failed to reasonably cooperate in TMS's defense of the Alabama Action, by among other things, misrepresenting that it returned Diehl's payments to Diehl, when in fact that was not the case.

54. Accordingly, LoanCare has failed to satisfy the requisite conditions for indemnification under the Agreement.

**WHEREFORE**, TMS requests a judgment from this Court declaring that: (a) TMS had no duty to defend LoanCare with regard to the claims against it in the Alabama Action; (b) TMS does not have a duty to defend LoanCare with regard to the claims in the Alabama Action now or in the future; (c) all fees and expenses incurred by TMS in defending LoanCare and itself in the Alabama Action are to be reimbursed by LoanCare; and (d) TMS has no obligation to indemnify LoanCare should damages be assessed against LoanCare.

### COUNT TWO
(Declaratory Judgment)

55. TMS incorporates each of the allegations set forth above as if fully set forth herein.

56. Under the Agreement, LoanCare agreed to "indemnify, defend, and hold [TMS] harmless from any losses resulting or arising out of . . . gross negligence arising solely from [LoanCare's] own acts or omissions."

57. The Agreement required LoanCare to "perform and discharge its duties, covenants, and obligations as subservicer . . . with a degree of care that is no less than that provided by industry subservicers generally."

58. As set forth above, it was LoanCare's gross negligence that caused TMS to believe Diehl was in default under her note and mortgage, ultimately resulting in the Alabama Action.

59. Equally true is that, although the industry standard would have been for LoanCare to either return the January and April 2016 payments to Diehl or remit them to TMS, LoanCare breached that duty by, among other things, retaining Diehl's January and April 2016 payments for approximately two years without ever notifying TMS or returning the payments to Diehl.

60. Further, while LoanCare was a co-defendant in a lawsuit with TMS that concerned those payments, LoanCare failed to remit those payments to TMS until almost a year after the lawsuit had commenced.

61. LoanCare has demonstrated an utter disregard for the level of due care provided by industry subservicers generally.

62. LoanCare's conduct in performing its obligations under the Agreement caused TMS to begin the collection efforts against Diehl that are at issue in the Alabama Action.

63. Therefore, the Alabama Action is the sole result of LoanCare's gross negligence.

**WHEREFORE**, TMS requests a judgment from this Court declaring that: (a) LoanCare has a duty to defend TMS in the Alabama Action; (b) all fees and expenses incurred by TMS in defending LoanCare and itself in the Alabama Action be reimbursed by LoanCare; and (c) LoanCare is obligated to indemnify TMS for any damages assessed against TMS in the Alabama Action.

## COUNT THREE
(Breach of the Covenant of Good Faith and Fair Dealing)

64. TMS incorporates each of the allegations set forth above as if fully set forth herein.

65. The Agreement constitutes a valid and binding contract between TMS and LoanCare.

66. Accordingly, the Agreement carried with it an implied covenant of good faith and fair dealing, which prevents a party from exercising its contractual discretion in bad faith.

67. As set forth above, the Agreement required LoanCare to "perform and discharge its duties, covenants, and obligations as subservicer . . . with a degree of care that is no less than that provided by industry subservicers generally."

-12-

68. LoanCare exercised its contractual discretion with respect to its handling of the two Diehl Loan payments in bad faith when it received payments from Diehl, yet opted not to notify TMS that it had received the payments for nearly two years, or return the payments to Diehl.

69. Worse yet, LoanCare did so while knowing the Diehl Loan payments were the subject of Diehl's lawsuit against TMS and LoanCare.

70. In addition to the above, LoanCare failed to exercise its discretion to reasonably cooperate in the defense of the Alabama Action, by among other things, misrepresenting that it returned Diehl Loan payments to Diehl, when in fact that was not the case, and LoanCare has not provided any proof or evidence that they ever returned either of these payments.

71. In light of the above, LoanCare exercised its contractual discretion under the Agreement in bad faith.

72. Accordingly, LoanCare has breached its duty of good faith and fair dealing, and in so doing, breached the Agreement with TMS.

**WHEREFORE**, TMS demands judgment in its favor and against LoanCare, awarding damages, attorneys' fees, costs, and such other relief this Court deems just and proper.

-13-

               */s/ Colleen Fox*
               Colleen Fox
               **SAUL EWING ARNSTEIN & LEHR LLP**
               650 College Road East, Suite 4000
               Princeton, NJ 08540
               P: (609) 452-3100
               F: (609) 452-6104

               Francis X. Riley III
               **SAUL EWING ARNSTEIN & LEHR LLP**
               650 College Road East, Suite 4000
               Princeton, NJ 08540
               P: (609) 452-3100
               *Pro Hac Vice Attorney*

               *Attorneys for Plaintiff The Money Source, Inc.*

Princeton, New Jersey
June 20, 2018